## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| CATHERINE BAKER individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>CRODA INC. f/k/a CRODA, INC.,<br><br>     Defendant. | CIVIL ACTION NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Catherine Baker ("Plaintiff"), individually and on behalf of a putative class of all other similarly situated persons ("Class Members" or the "Class"), sues Defendant Croda Inc. f/k/a Croda, Inc. ("Croda" or "Defendant"), and, based on personal knowledge and on investigation of counsel and review of public documents and information, alleges as follows:

### INTRODUCTION

1. Plaintiff brings this class action against Croda, the owner of the Atlas Point manufacturing plant in New Castle, Delaware, for damages resulting from its dangerous and reckless emission of Ethylene Oxide ("EtO").

2. EtO is a powerful cancer-causing gas. The United States Environmental Protection Agency ("EPA"), the National Toxicology Program, the World Health Organization ("WHO"), and the International Agency for Research on Cancer ("IARC"), among others, all classify EtO as a known human carcinogen.

3. Croda's Atlas Point plant produces surfactants—surface-acting agents—compounds that lower the surface tension between two liquids, between a gas and a liquid, or between a liquid and a solid allowing them to bind. Surfactants may act as detergents, wetting agents, emulsifiers,

foaming agents, and dispersants. The surfactant manufacturing process includes the use of EtO. During the manufacturing process, EtO is emitted into the atmosphere by Defendant in both controlled and uncontrolled releases.

4.      Plaintiff and Class Members have lived within a specified geographic area around the Atlas Point plant of Defendant defined by census tracts, and have been exposed to large amounts of toxic, cancer-causing EtO as a result of releases from the Atlas Point plant. Although EtO is odorless and colorless, and Plaintiff and Class Members can neither see nor smell the gas; it is all around them and in the air they breathe.

5.      As a result of their exposure to the EtO emitted by Defendant, Plaintiff and Class Members' present risk of acquiring disease is among the highest in the United States.  Indeed, the EPA estimates that Class Members are up to 4 times more likely to develop cancer than the average American.  The illness, disease and disease processes that exposure to EtO can cause is often latent, meaning not easily detected without diagnostic testing, particularly in their early stages.

6.      As a result of Croda's irresponsible and reckless conduct, Plaintiff and Class Members have been exposed to EtO, a known carcinogen and toxin. As a result of their exposure Plaintiff and Class Members suffer a present increased risk of illness, disease, and disease process. This present increased risk of illness, disease and disease process has caused Plaintiff and Class Members to have the present medical need for diagnostic testing (also known as medical monitoring) for the early detection of those illnesses, diseases and disease processes, including cancer, that exposure to EtO can cause.  Medical monitoring is reasonably medically necessary for those exposed to ensure that latent disease processes can be immediately identified and aggressively treated. Plaintiff and Class Members have been injured by the present need to incur the costs of diagnostic testing for the early detection of illness, disease or disease process.

7.     Plaintiff, individually and on behalf of Class Members, seeks compensatory damages arising out of chemical releases, discharges, and leaks from Croda's Atlas Point plant. These damages include the cost of a medical monitoring program for continual screening and detection of illness, disease, or disease processes necessitated by the exposure to toxic EtO released by the Defendant.

## PARTIES

8.     Plaintiff Catherine Baker is a citizen of Delaware and lives in New Castle County. As a result of Defendant's operations at Atlas Point, Plaintiff has been exposed to, and inhaled, high levels of EtO.

9.     Croda is a Delaware corporation with its principal place of business in New Jersey, 300-A Columbus Circle Edison, New Jersey, 08837. Croda is the sole owner and operator of Atlas Point located at 315 Cherry Lane, New Castle, Delaware, 19720. The Atlas Point plant has been in its current location since 1937 and was purchased by Croda in 2006.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are more than 100 putative Class Members, and at least some Members of the proposed Class have a different citizenship from the Defendant.

11.    This Court has jurisdiction over Croda because it is incorporated in Delaware and because Croda's Atlas Point plant is located in Delaware.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant's the Atlas Point plant is in this District and because a substantial part of the events and omissions giving rise to this action occurred in this District.

## STATEMENT OF FACTS

**A.     ETHYLENE OXIDE**

13.     EtO is a colorless, odorless gas used in the manufacture of antifreeze, solvents, detergents, polyurethane foam, adhesives and other products. It is also used to sterilize medical equipment and plastic devices.[1]

14.     Commercial chemical producers process EtO to synthesize Ethylene Glycol, a building block for synthetic fibers (e.g., upholstery, carpet), plastics, PVC pipe and cosmetics and as well as a primary ingredient in antifreeze.[2]

15.     At the end of 2018, EtO was being produced in the U.S. at 15 facilities in 11 locations by 9 companies.[3]

16.     Defendant's Atlas Point plant manufactures, processes and or uses and emits significant amounts of EtO gas every year. Since at least 1988, Atlas Point has emitted multiple tons of EtO gas into the air of the geographic area in which Plaintiff and Class Members reside.[4]

17.     Unfortunately, people cannot see or smell EtO when it is in the air.[5]  As such, Plaintiff and Class Members have unknowingly been exposed to toxic EtO for decades while Croda knew, or should have known, that the EtO it was releasing was dangerous, toxic, carcinogenic, mutagenic, and harmful to local residents.

**B.     HEALTH EFFECTS OF ETHYLENE OXIDE EXPOSURE**

18.     EtO is one of 187 pollutants that EPA has classified as "hazardous air pollutants," also called "air toxics."  It is dangerous, toxic, carcinogenic, and mutagenic. EtO is highly reactive,

---

[1] https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/background-information-ethylene-oxide#what
[2] https://www.epa.gov/il/ethylene-oxide-emissions-frequent-questions
[3] https://www.americanchemistry.com/EO/Ethylene-Oxide-Frequently-Asked-Questions.html
[4] *See e.g.* Air Pollution Report, https://echo.epa.gov/air-pollutant-report?fid=110000338652; https://enviro.epa.gov/triexplorer/facility_data?tri_facility_id=19720CMRCSCHERR&tri=TRIQ1
[5] https://www.epa.gov/il/ethylene-oxide-emissions-frequent-questions

readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body.  Its deleterious properties have been widely known for decades.

19.     While acute inhalation exposure to high concentrations of EtO can cause headache, dizziness, nausea, fatigue, respiratory irritation, vomiting and other types of gastrointestinal distress, studies show that exposure to EtO increases the risk of cancers of the white blood cells, including, but not limited to, non-Hodgkin lymphoma, myeloma, and lymphocytic leukemia. Studies also show that long-term exposure to EtO increases the risk of breast cancer in females.[6]

20.     Manufacturers and users of EtO became aware of its carcinogenic effects at least by 1977, when the National Institute of Occupational Safety and Health ("NIOSH") recommended that EtO be considered as mutagenic and potentially carcinogenic to humans, that occupational exposure be minimized, and that alternate sterilization procedures be used.[7]  In 1981, based on additional laboratory studies wherein EtO induced cancer in animals, NIOSH reconfirmed its concerns that EtO was a potential occupational carcinogen.[8]

21.     In 1985, the United States Department of Health and Human Services ("DHHS") published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

22.     In 1987, the state of California officially designated EtO a carcinogen.

23.     NIOSH subsequently published an epidemiological study of EtO which analyzed over 18,000 employees working with EtO at 14 different industrial facilities. The study found

---

[6] https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/frequent-questions-health-information-about-ethylene-oxide
[7] Center for Disease Control & Prevention, Special Occupational Hazard Review With Control Recommendations: Use Of Ethylene Oxide As A Sterilant In Medical Facilities, August 1977, https://www.cdc.gov/niosh/docs/77-200/default.html
[8] Center for Disease Control, Current Intelligence Bulletin 35, May 1981, EtO: Evidence of Carcinogenicity, https://www.cdc.gov/niosh/docs/81-130/default.html

sufficient evidence to support a causal link between exposure to EtO and increased mortality from lymphatic and hematopoietic cancers.[9]

24.     As a result of these findings and others, in 1994 the WHO listed EtO as a Group 1 human carcinogen, the body's highest risk classification. In 2000, the U.S. Department of Health and Human Services revised its classification for EtO as "known to be a human carcinogen."

25.     Exposure to EtO has been widely studied and its negative health effects are well documented.[10]  Presently, there is evidence linking EtO exposure to increased risk of lymphatic and hematopoietic cancer such as lymphomas, myelomas, and leukemias; breast cancer; tumors in the lungs, uterus, and the brain; cancers in connective tissues and bones; and reproductive and developmental impairments including increased rates of miscarriage and infertility.

26.     EPA classified EtO as a human carcinogen in December 2016 and considers any exposure, however small, to create a cancer risk. This is because EtO is a powerful mutagen and can damage DNA.[11]

## C.     CRODA'S ETHYLENE OXIDE EMISSIONS

27.      Croda's Atlas Point plant produces up to 30,000 metric tons of EtO annually, which is used in surfactant production and the creation of ethylene glycol, a liquid used as a raw material in the manufacture of polyester fibers and for antifreeze formulations.[12]  In the course of these processes, Defendant releases huge amounts of EtO gas every year. Since at least 1988, the Atlas Point plant has emitted multiple tons of EtO gas into the air in the Class Zone defined below.

---

[9] Steenland, K, *et. al.,* Mortality analyses in a cohort of 18,235 ethylene oxide exposed workers: Follow up extended from 1987 to 1998 (2004), Occup Environ Med 61:2-7, https://www.ncbi.nlm.nih.gov/pubmed/14691266
[10] https://www.epa.gov/sites/production/files/2016-09/documents/ethylene-oxide.pdf
[11] https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/frequent-questions-health-information-about-ethylene-oxide
[12] What else is at plant where gas leak that shut down Delaware Memorial Bridge occurred?, Delaware online, November 26, 2018, https://www.delawareonline.com/story/news/local/2018/11/26/what-else-delaware-plant-where-dangerous-gas-leak-occurred/2112981002/

28.     The EtO emitted by Defendant's Atlas Point plant is carried by ambient air movements throughout the Class Zone defined below. The EtO remains in the air for months, becomes concentrated in atmospheric inversions, and moves through neighboring communities through prevailing winds. Because its half-life in the atmosphere is 211 days, EtO remains in the air that Plaintiff and Class Members breath long after it has been emitted, resulting in inhalation by Plaintiff and Class Members.[13]

29.     In addition, EtO is heavier than air, meaning that it can linger and travel along the ground.[14] Consequently, Defendant's continuing releases of EtO are likely to have lingered at breathing level in the communities around its plant for a considerable time, causing ongoing and prolonged harm to Plaintiff and Class Members.

30.     Unfortunately, people cannot see or smell EtO when it is in the air.[15] As such, Plaintiff and Class Members have unknowingly been exposed to EtO for decades while Defendant knew, or should have known, that the EtO it was releasing was dangerous, toxic, carcinogenic, mutagenic, and harmful to local residents.

## D.     NEW CASTLE AIR QUALITY AND THE HEALTH IMPLICATIONS

31.     The Atlas Point plant has been in operation since 1937, when it was first used to produce commercial quantities of sorbitol and mannitol.[16]

32.     Shortly thereafter, the Atlas Point plant transitioned to the creation and manufacturing of popular emulsifiers that in turn lead to the development and production of surfactants like Spans® and Tweens®.[17]

---

[13] https://www.ncbi.nlm.nih.gov/books/NBK321408/
[14] https://www.atsdr.cdc.gov/mmg/mmg.asp?id=730&tid=133
[15] https://www.epa.gov/il/ethylene-oxide-emissions-frequent-questions
[16] https://www.adhesivesmag.com/articles/91630-focus-on-marking-a-milestone
[17] *Id*.

33.     By the time Croda acquired the Atlas Point plant in 2006 through the purchase of then-owner Uniqema from Imperial Chemical Industries, the facility had been continuously producing surfactants for nearly 70 years.[18]

34.     Upon information and belief, Croda acquired all or substantially all of the Atlas Point plant's manufacturing assets from Uniqema in 2006, and continued to produce surfactants using, among other substances, EtO, in essentially the same manner as all previous owners and operators of the Atlas Point plant including, but not limited to, Uniqema, since at least 1988.

35.     In 2008, the Atlas Point plant had a documented unpermitted release of EtO. Since 2008, the Atlas Point plant has violated the State of Delaware Department of Natural Resources and Environmental Control ("DNREC") regulations including the failure to monitor for and record emissions, best management practices violations, failure to make timely permit applications, and excess emissions.[19]

36.     Indeed, in 2015, Croda announced that it was adding a new facility to the Atlas Point plant, which would provide the ability to produce EtO directly on site for use in manufacturing surfactants.[20] The facility was opened in October 2017.

37.     On  November 25, 2018, Atlas Point reported an emissions accident at the new EtO production plant which resulted in the release of 2,688 pounds of EtO into the air surrounding the plant.[21] A call was sent out through the Delaware Emergency Notification System ("DENS") to advise residents in the nearby area to seek shelter.  The massive release resulted in the closure of the Delaware Memorial Bridge for 7 hours.  In addition to the tons of EtO released into the air,

---

[18] *Id*.
[19] https://www.delawareonline.com/story/news/local/2018/11/26/what-else-delaware-plant-where-dangerous-gas-leak-occurred/2112981002/, last accessed 08.01.20.
[20] https://cen.acs.org/articles/93/i18/Croda-Produce-Bio-Ethylene-Oxide.html
[21] https://dnrec.alpha.delaware.gov/croda-questions-answers/

700,000 gallons of deluge water, used by Croda to minimize the ambient air concentration of EtO and to minimize the risk of explosion or ignition of the released EtO, overflowed the spill sump and discharged onto the ground and into the wooded area behind the plant.

38.     On March 28, 2019, Croda entered into a settlement agreement with DNREC wherein Croda was found to have violated, *inter alia*, 7 Del. C. § 6003(a)(1), through the unpermitted release of EtO and 3.38 of Permit APC-2016/0068 - Construction (Amendment 3) by not maintaining and operating its plant in a manner consistent with good air pollution control practice for minimizing emissions, when it used the incorrect gasket that ultimately failed and resulted in the release of EtO emissions on November 25, 2018.[22]  DNREC stated that the gasket material was unsuitable for EtO processing.[23] The material did not comply with the engineering specifications for the plant.[24] Croda had conducted the conditional operation of its plant without the approval of DNREC. *Id*.

39.     The federal Occupational Safety and Health Administration, DNREC and other state agencies imposed more than $500,000 in fines and penalties on Croda for operating the plant without proper inspection, failure to train workers adequately, and failure to have proper leak-shutdown procedures and other failures leading up to the leak.[25]

40.     The EPA's 2014 National Air Toxics Assessment ("NATA"), a screening tool for state, local and tribal agencies to assist them in identifying pollutants and emissions in their communities, demonstrated severe cancer risks in the area surrounding the Atlas Point plant. The

---

[22] Q & A: Croda Ethylene Oxide Release November 25, 2018, November 19, 2019, https://dnrec.alpha.delaware.gov/croda-questions-answers/
[23] https://www.paintsquare.com/news/?fuseaction=view&id=22088/ last accessed 08.01.20.
[24] http://www.dnrec.delaware.gov/Info/Documents/20190328-croda-settlement-agreement-and-dnrec-secretarys-order-no-2019-a-0014.pdf, last accessed 08.01.20
[25] https://www.inquirer.com/business/croda-delaware-atlas-point-gas-leak-osha-report-20190611.html, last accessed 08.01.20.

2014 NATA places the cancer risks of the census tracts measured in and around Atlas Point as the highest in Delaware and among the highest in the country. Specifically, the EPA has designated the geographic area within Delaware census tracts 10003015400, 10003105502 and 10003015802 as having increased risk for cancer.

41.     The NATA database also makes clear that the elevated cancer risks in and around Atlas Point are almost entirely a result of Croda's EtO emissions.

42.     While the 2014 NATA reveals shockingly high risks of cancer across a large area near the Atlas Point plant, these risks are likely understated as they do not reflect the totality of Croda's emissions.

43.     New Castle County, where the Atlas Point plant is located, is the smallest county in the state by area, but has the highest population and population density of any county in Delaware.

44.     Throughout the Class Period, as defined below, the area around the Atlas Point plant has contained numerous homes and businesses, as well as numerous schools and daycare facilities. As a result, thousands of residents have been exposed to elevated levels of EtO.

45.     Defendant operated without sufficient pollution controls to adequately limit and/or eliminate the emissions of toxic EtO and, as a result, exposed the thousands of residents in the Class Zone defined below to a carcinogenic, mutagenic chemical that increased their likelihood of developing cancer.

46.     Defendant knew that: (1) its manufacturing plant operated without sufficient pollution control systems necessary to reduce or eliminate releases of toxic EtO; (2) the release of EtO spread well beyond the property boundaries of the Atlas Point plant and resulted in exposure to residents in the Class Zone defined below; and (3) on-going exposure to EtO, a known carcinogen, would result in the increase of the risk of illness, disease or disease process for nearby residents and an increase the likelihood that nearby residents would develop cancer.

47.     Defendant negligently failed to implement control processes that would eliminate EtO emissions, failed to adopt alternative processes that would eliminate EtO emissions, and failed to warn the Plaintiff and Class Members that the air was materially contaminated with toxic levels of EtO.

48.     Throughout the course of its operation of the Atlas Point plant, Defendant released EtO into the environment.

49.     Defendant's conduct unnecessarily contaminated the air Plaintiff and Class Members breathe every day, and exposed Plaintiff and Class Members to unsafe air. As a result, Plaintiff and Class Members have inhaled toxic EtO released from Defendant's Atlas Point plant.

**E.     PLAINTIFF AND CLASS MEMBERS HAVE ALREADY SUFFERED DAMAGES AND REQUIRE DIAGNOSTIC TESTING**

50.     Plaintiff and Class Members have lived within the vicinity of the Atlas Point plant during the time Defendant and predecessors in interest have been emitting and exposing the residents of nearby areas to toxic levels of EtO.

51.     As a result of Defendant's negligent and reckless emissions of EtO, Plaintiff and Class Members have inhaled toxic EtO, suffering significant exposure to hazardous EtO gases.

52.     EtO is a proven hazardous substance. It is a human carcinogen and is unsafe for humans at any level of exposure.

53.     Plaintiffs and Class Members live in the Class Zone defined by specified census tracts which pose a materially increased risk of developing cancer and other illness, disease and disease processes, as compared to the vast majority of the U.S. population living in other areas.

54.     As a proximate result of Defendant's negligent and reckless conduct, Plaintiff and Class Members are at an increased risk of developing cancer, and other illness, disease and disease processes, resulting in their present medical need for periodic diagnostic medical examinations.

55.     Diagnostic testing for early detection of cancer and other illness, disease and disease processes caused by exposure to EtO is reasonably medically necessary to assure early diagnosis, effective treatment of the disease.

56.     Plaintiff and Class Members have suffered the present harm of the need for the cost of diagnostic testing for the early detection of cancer and other illness, disease and disease processes. As a result of their significant exposure to Defendant's hazardous EtO gases, Plaintiff and Class Members require an award of the cost of a medical monitoring program necessary for early detection of the onset of illnesses, disease processes or disease.

57.     Monitoring procedures exist that make possible the early detection of cancer, the disease processes of cancer, and the progression of biomarker abnormalities, and other illness, disease and disease processes. These monitoring procedures will benefit Plaintiff and Class Members, and they are different from what would normally be recommended in the absence of EtO exposure. Such diagnostic testing is reasonably medically necessary due to the exposure of Plaintiff and Class Members to Defendant's EtO hazardous emissions. Plaintiff and Class Members have been injured by the present need to incur the costs of such diagnostic testing for the early detection of illness, disease or disease process.

58.     Plaintiff's and Class Members' claims are based solely on the amount of exposure to EtO released from Defendant's Atlas Point facility. Therefore, any alleged alternative exposure, or prior medical or family history, is not a basis for Plaintiff's and Class Member's claims in this case.  Exposure greater than the minimum specified in the class definition below only increases the

risk Plaintiff and the Class Members suffer over the baseline risk caused by Defendant's tortious conduct.

59.     As a direct result of Defendant's tortious and reckless conduct, Plaintiff and the Class have a present need to incur the cost of the costly diagnostic testing, and the cost of the monitoring procedures that are reasonably necessary to enable Plaintiff and Class Members to obtain early detection and diagnosis of medical conditions, including abnormalities indicative of cancer.

60.     Plaintiff and Class Members seek as damages the costs of a medical monitoring program for such diagnostic testing for the early detection of onset of illnesses, disease processes or disease and to allow for early treatment beneficial to Plaintiff and Class Members.

61.     Plaintiff and Class Members also seek all other available and necessary relief in connection with this claim.

## CLASS ALLEGATIONS

62.     Plaintiff seeks relief on behalf of herself and as representative of all others who are similarly situated. Pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of a class defined as follows:

> All natural persons who have resided within census tracts 10003015400, 10003105502 and 10003015802 (the "Class Zone") for a period of one year or more at any time beginning January 1, 1988 and the present (the "Class Period").



Fig. 1: The Class Zone is represented in the dark purple and light blue shaded areas. The green and yellow shaded areas lie outside of the Class Zone. The Atlas Point plant is designated by the brown dot.

63.     Excluded from the Class are Defendant and any of its affiliates, parents or subsidiaries; all employees of Defendant; all persons who have been currently diagnosed with cancer or illness, disease or disease process of the kind caused by EtO; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

64.      Plaintiff hereby reserves the right to amend or modify the class definition with greater specificity or division after having had an opportunity to conduct discovery.

65.     The proposed Class meets the criteria for certification under Fed R. Civ. P. 23(a), (b)(2), (b)(3) and (c)(4).

66. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the Members of the Class are so numerous and geographically dispersed that the joinder of all Members is impractical. While the exact number of Class Members is unknown to Plaintiff at this time, the proposed Class includes thousands of current and former residents who were unlawfully exposed to EtO. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

67. **Commonality. Rule 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

a.   Whether Defendant's conduct was negligent;

b.   Whether Defendant's conduct constitutes a public nuisance;

c.   Whether Defendant's conduct constitutes an abnormally dangerous activity;

d.   Whether Defendant owed a duty of care to Class Members;

e.   Whether the duty of care owed to the Class included the duty to protect against exposures to unsafe and unnecessarily high levels of EtO emissions;

f.   Whether Defendant breached its duty to warn the Class of and protect the Class from the long-term health risks and consequences of exposure to high levels of EtO;

g.   Whether medical monitoring and early detection will provide benefits to Members of the Class; and

h.   Whether Plaintiffs and Class Members are entitled to relief.

15

68.     **Typicality. Rule 23(a)(3).**   Consistent with Rule 23(a)(3), Plaintiff's claims are typical of those of the putative Class Members. Plaintiff resides in census tract 10003015802, within the Class Zone surrounding the Atlas Point facilities, and has resided in the Class Zone for over one year.  Plaintiff has had exposure to EtO released from the Atlas Point facility as have all Class Members.  That exposure has resulted in an increased risk of illness and disease in Plaintiff as it has in all class members. Plaintiff has the same, reasonably medically necessary, need to incur the cost of diagnostic testing for the early detection of illness and disease as all Class Members. Plaintiff therefore seeks the same relief as Class Members: the cost of a medical monitoring program for the early detection of illness, disease or disease process.

69.     **Adequacy. Rule 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a Member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class.   Plaintiff has no conflicts of interest with the Class. Plaintiff's Counsel are competent and experienced in litigating class actions. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of Class Members.

70.     **Superiority. Rule 23(b)(3).**   Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for

inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

71.     **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

72.     Likewise, particular issues are appropriate for certification under Rule 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## COUNT I

## ULTRAHAZARDOUS ACTIVITY/STRICT LIABILITY

73.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 72 as if fully set forth herein.

74.     As successor and current owner of the Atlas Point plant, Defendant's use and emission of EtO at its Atlas Point plant constitutes an ultrahazardous activity.

75.     Defendant's manufacture, processing and use of EtO is an abnormally dangerous activity and cannot be made safe by the exercise of the utmost care. The procedures utilized at the Atlas Point plant resulted in emissions of EtO to the Class Zone, which poses a high degree of risk to Plaintiff and Class Members.

76.     There is a reasonable likelihood that the emissions of EtO will result in life-threatening cancer and other illness, disease and disease processes. This risk cannot be eliminated as long as EtO is emitted into populated areas. Likewise, it was completely inappropriate for

17

Defendant to locate and operate their Atlas Point plant in a populated area while at the same time causing large amounts of EtO to be emitted into the atmosphere.

77.     Defendant's emission of EtO created a high degree of risk of harm to those who live in the surrounding area and substantially increased their risk of developing cancer and other illness, disease or disease processes.

78.     The activities conducted by Defendant are exceedingly dangerous and offer little or no value to the surrounding community.

79.     Because these activities are ultrahazardous, Defendant is strictly liable for any injuries proximately resulting therefrom.

80.     As a direct and proximate result of Defendant's ultrahazardous activity and the exposure to EtO resulting therefrom, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease or disease process, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease or disease process. Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection.

## COUNT II

## PUBLIC NUISANCE

81.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 80 as if fully set forth herein.

82.     At all times relevant hereto, Defendant, as successor and current owner of the Atlas Point plant, knew EtO to be hazardous and harmful to human beings.

83.     Plaintiff and Class Members have a common right to breathe clean air without dangerous levels of carcinogens such as EtO.

84.     Defendant's unreasonable use and emission of EtO at its Atlas Point plant substantially and unreasonably infringes upon and transgresses this public right.

85.     Defendant knew or should have known that the levels of EtO gas emitted from its plant would have a deleterious effect upon the health, safety, and well-being of people living in the nearby areas.

86.     Defendant's operation of its Atlas Point plant caused those who live in the surrounding area to breathe air containing high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

87.     As a proximate result of the Defendant's operation of its plant, Plaintiff and the general public's common right to breathe clean air without dangerous levels of carcinogens such as EtO was eliminated and/or severely diminished.

88.     As a proximate result of Defendant's operation of its plant, EtO continuously invaded and contaminated the areas surrounding Plaintiff's and Class Members' residences, thereby exposing them to EtO.

89.     As a direct and proximate result of Defendant's creation of a public nuisance and the exposure to EtO resulting therefrom, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease or disease process, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease or disease process. Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection.

## COUNT III
## PRIVATE NUISANCE

90.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 89 as if fully set forth herein.

19

91.     At all times relevant hereto, Defendant, as successor and current owner of the Atlas Point plant, knew EtO to be hazardous and harmful to human beings.

92.     Defendant's unreasonable use and emission of EtO from its Atlas Point plant constituted an unreasonable invasion of Plaintiff's and the Class Members' interests and rights of reasonable use and enjoyment of their properties and their rights to enjoyment of life free from breathing toxic air contaminants.

93.     Defendant's unreasonable use and emission of EtO from its Atlas Point plant constituted negligent or reckless conduct.

94.     Defendant's unreasonable use and emission of EtO from its Atlas Point plant was an ultrahazardous or abnormally dangerous condition or activity and thus constitutes an absolute nuisance, or nuisance per se, for which Defendant is strictly liable.

95.     Defendant's unreasonable use and emission of EtO from its Atlas Point plant violated existing laws intended to protect public health and safety, and thus Defendant's conduct constitutes an absolute nuisance, or nuisance per se, for which Defendant is strictly liable.

96.     For example, Defendant violated 7 Del. C. § 6003(a)(1) through the unpermitted release of ethylene oxide.

97.     Defendant also violated Condition 3.38 of Permit APC-2016/0068-CONSTRUCTION (Amendment 3) by not maintaining and operating its facility in a manner consistent with good air pollution control practice for minimizing emissions.

98.     Defendant also violated 7 Del. C. § 6003(a)(2) and sections 3.2.1 and 3.2.3 of 7 DE Admin. Code 7201, for the unpermitted release of deluge water, used to contain the release of ethylene oxide in the air.

99.     Defendant's operation of its Atlas Point plant caused those who live in the surrounding area to breathe air containing high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

100.     As a proximate result of the Defendant's operation of its plant, Plaintiff and the Class Members' common rights to breathe clean air without dangerous levels of carcinogens such as EtO were infringed and/or severely diminished.

101.     As a proximate result of Defendant's operation of its plant, EtO continuously invaded and contaminated the areas surrounding Plaintiff's and Class Members' residences, thereby exposing them to EtO.

102.     As a direct and proximate result of Defendant's creation of a private nuisance and the exposure to EtO resulting therefrom, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease or disease process, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease or disease process.  Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection.

## COUNT IV

## NEGLIGENCE

103.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 102 as if fully set forth herein.

104.     As successor and current owner of the Atlas Point plant, Defendant owed Plaintiff and Class Members a duty to operate its Atlas Point plant in a manner which would not cause Plaintiff and Class Members injury or harm, and Plaintiff and Class Members were foreseeable victims located within the scope of the risk created by the Defendant's conduct.

105.     Defendant negligently breached its duty of care by releasing and allowing the release of EtO from its Atlas Point plant, by failing to take steps to minimize or eliminate the release of EtO, by failing to utilize alternative procedures that would not result in the release of EtO, failing to use proper materials in constructing the plant, failing to institute proper procedures and training for response to releases of toxic EtO, and by releasing EtO into a heavily populated community.

106.     Defendant owed Plaintiff and Class Members a duty of reasonable care commensurate with the risk of operating the Atlas Point plant.

107.     Given the likelihood of contamination of neighboring areas and exposure to their residents, Defendant had a duty to investigate the extent to which EtO released from the Atlas Point plant was likely contaminating the air at levels to materially increase nearby residents' likelihood and risk of developing cancer and other diseases.

108.     Defendant negligently breached its duty by, *inter alia:*

   a.   Emitting dangerous amounts of EtO into the air;

   b.   Failing to employ safe methods to adequately control or eliminate EtO emissions from the plant;

   c.   Failing to use alternative procedures which would not result in the emission of EtO into neighboring communities;

   d.   Failing to locate its EtO processing to an unpopulated, or at least much less populated, area; and

   e.   Failing to warn neighboring residents that they were being exposed to EtO and of the consequent risks of disease the residents acquired because of that exposure.

109.     As a direct and proximate result of Defendant's negligence and their exposure to EtO, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present

22

increased risk of illness and disease, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease or disease process. Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection.

**COUNT V**

**WILLFUL AND WANTON CONDUCT**

110.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 109 as if fully set forth herein.

111.    At all times relevant, Defendant, as successor and current owner of the Atlas Point plant, owed a duty to refrain from willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff and those living in the areas surrounding its plant.

112.    Upon information and belief, Defendant was, at all times relevant, aware that EtO is highly carcinogenic, mutagenic and/or otherwise harmful to humans.

113.    Upon information and belief, Defendant was, at all times relevant, aware of the considerable health risks associated with the emission of EtO from the Atlas Point plant, including the risk of causing various forms of cancer in the surrounding population.

114.    Upon information and belief, Defendant was, at all times relevant, aware that its processing of EtO and the production of surfactants at the Atlas Point plant actually resulted in the unreasonably dangerous emission of EtO into the surrounding communities.

115.    Notwithstanding this actual knowledge, Defendant breached its duties by, among other things:

        a.   Emitting dangerous amounts of EtO into the air;

23

b.  Failing to employ safe methods to adequately control EtO emissions from its plant;

c.  Failing to use alternative procedures which would not result in the emission of EtO into neighboring communities;

d.  Failing to locate its EtO processing facilities in an unpopulated or less populated area;

e.  Failing to warn neighboring residents that they were being exposed to EtO and of the consequent risks of disease the residents acquired because of that exposure;

f.  Failing to take steps to minimize or eliminate the release of EtO, by failing to utilize alternative procedures that would not result in the release of EtO

g.  Failing to use proper materials in constructing the plant; and

h.  Failing to institute proper procedures and training for response to releases of toxic EtO.

116.    Defendant's failures in these and other respects in the face of actual knowledge regarding the risks of unreasonable EtO emissions constitutes willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff and those living in the areas surrounding its Atlas Point plant.

117.    As a direct and proximate result of Defendant's willful, wanton, reckless and outrageous conduct, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease or disease process, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease or disease process. Plaintiff and Class Members therefore seek as damages the cost of a

24

medical monitoring program for such detection, which has been made reasonably medically necessary as a result of Defendant's conduct.

## COUNT VI

## MEDICAL MONITORING

118.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 117 as if fully set forth herein.

119.    Plaintiff and Class Members have been significantly exposed to EtO levels that are far higher than normal background levels. EtO is a dangerous carcinogen that has been proven to cause cancer in humans.

120.    Plaintiff and Class Members came into direct contact with EtO due to Defendant's tortious actions.

121.    As a proximate result of their exposure to EtO, Plaintiff and Class Members have a significantly increased risk of contracting several different types of cancer. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

122.    Monitoring procedures exist that makes early detection of these cancers possible and beneficial. These monitoring procedures are different than those normally recommended in the absence of toxic exposures and are reasonably necessary due to Plaintiff's and Class Members' exposures to EtO.

123.    As a result, Plaintiff and the Class should be awarded the quantifiable costs of such a monitoring regime.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

a.      For an Order certifying the Class, as defined herein, and appointing Plaintiff and their Counsel to represent the Class;

b.      For an award of damages, including nominal and compensatory damages, as allowed by law and in an amount to be determined;

c.      For an award to fund a medical monitoring program in an amount determined just and reasonable;

d.      For an award of punitive damages as allowed by law and in an amount to be determined;

e.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f.      For prejudgment interest on all amounts awarded;

g.      For injunctive and declaratory relief, under Rule 23(b)(2) and (c)(4) and as otherwise allowed by law, including,

        i.   Injunctive relief under 23(b)(2) as necessary and appropriate to establish a court-supervised program of medical monitoring for the medically necessary diagnostic testing for the early detection of illness, disease or disease process; and

        ii.  Issue certification under Rule 23(c)(4) as necessary and appropriate to provide declaratory relief as to each element of each cause of action alleged herein (ultrahazardous activity/strict liability, private nuisance, public nuisance, negligence, willful and wanton conduct, and medical monitoring).

h.      Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

Date: August 24, 2020

*Attorneys for the Plaintiff and
the Putative Class*

*/s/ Kyle J. McGee*
Kyle J. McGee (DE # 5558)
Thomas V. Ayala (DE # 6629)
M. Elizabeth Graham*
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
kmcgee@gelaw.com
tayala@gelaw.com
egraham@gelaw.com
P: (302) 622-7000
F: (302) 622-7100

T. Michael Morgan*
MORGAN & MORGAN, P.A.
20 N Orange Ave., Suite 1600
Orlando, FL 32801
mmorgan@ForThePeople.com
P: (407) 418-2031
F: (407) 245-3384

John A. Yanchunis*
Marcio W. Valladares*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
jyanchunis@ForThePeople.com
mvalladares@ForThePeople.com
P: (813) 223-5505
F: (813) 223-5402

Rene F. Rocha*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
rrocha@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

Frank M. Petosa*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
8151 Peters Road
Suite 4000
Plantation, FL 33324
fpetosa@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

*Pro Hac Vice* forthcoming

*Attorneys for the Plaintiff and
the Putative Class*